# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **SEAN NEWBOLD, LEXIE FRIESEN, JARED LEAMAN,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**HEALTHEQUITY, INC.,**<br><br>**Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:24-CV-103-DAK-JCB<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Jared C Bennett |

This matter is before the court on Defendant HealthEquity, Inc.'s Rule 12(b)(6) Motion to Dismiss [ECF No. 83] and Motion to Sever Plaintiff's Claims [ECF No. 82]. On October 18, 2024, the court held a hearing on the motions. At the hearing, Plaintiffs Sean Newbold, Lexie Friesen, and Jared Leaman were represented by Laura Nielson, and Defendant was represented by Mark D. Tolman and Elena T. Vetter. The court took the motions under advisement. After carefully considering the memoranda filed by the parties and the law and facts pertaining to the motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Because the court accepts all well-pleaded facts in the Complaint as true in connection with a motion to dismiss, the court takes the following facts from Plaintiffs' Second Amended Complaint.[1]

Plaintiffs were formerly employed by Defendant HealthEquity, Inc. ("HQY"). Newbold and Friesen were employed at HQY as Data Operations Analyst IIs, and Leaman was a Senior Data Operations Analyst. Laurie Lehman, the Vice President of Data Integration Services, had

---

1  All citations to the Second Amended Complaint will be simply "Compl."

control over every position on the Data Integration Services department, in which they worked. Philip Taylor, the Senior Director of Data Integration Services and Lehman's subordinate, also had control over every position in the department. Plaintiffs allege that Lehman and Taylor showed a "disregard" for the rights of all their employees. Plaintiffs claim that Lehman and Taylor: threatened everyone with the possibility of termination or demotion to control them and deter them from complaining; refused to backfill vacated positions as people quit; pressured everyone to work overtime, with some employees working 90 hours a week; and blocked the promotions of anyone in protected classes, people objecting to discriminatory practices, or using FMLA leave.

1.  Newbold and Friesen

In March or April 2020, Newbold informed Lehman that he would be taking twelve weeks of FMLA leave, including two weeks of parental leave, for the birth of his child. On April 20, 2020, Newbold applied for an open Integration Engineer I position. On April 23, 2020, Newbold's child was born, and he commenced his twelve-week parental/FMLA leave. HQY did not interview Newbold for the Integration Engineer I position, and he learned from a coworker that HQY hired an individual named Adam Price for the position. Price had less experience at HQY, no degree, and less expertise in relevant coding languages that Newbold. Shane Gruchow was the hiring manager for the position, interviewed all the candidates for the position, allegedly has critical information as to how that specific job was filled without consideration of Newbold's application. Newbold does not specifically allege that Gruchow knew about his FMLA leave.

In the fall or winter of 2020, David Lloyd, the Data Operations Team Lead, voiced concerns to Lehman about his team's workload because some team members were working up to 80 hours a week and they needed Lehman to fill vacated positions. Lehman told Lloyd that if he

had a problem with the workload, he should step down as team lead and become an analyst to help them.

In May 2021, Newbold's "Team Lead" Aaron Hunt quit and recommended to his direct supervisor, Mike King, that Friesen should replace him as Team Lead because she was the most qualified person for the position. At the time, Friesen was pregnant. King's direct supervisor was Taylor. At the time, both Lehman and Taylor knew that Friesen was pregnant and planned to take FMLA leave when her baby was born.

HQY did not create an internal posting for the Team Lead position, and Friesen did not get to apply or be interviewed for the position. HQY, through Taylor, subsequently announced that an individual named Paul Russ would become Team Lead. Although Taylor communicated the decision that Russ would become Team Lead, Friesen does not allege who specifically had the decision-making authority in selecting the new Team Lead. Russ had no experience with the Data Operations Team's systems and had only worked with a different company that HQY acquired for about a year. Friesen had worked at HQY for over five years at the time Hunt left as Team Lead and was an expert at the Data Operations Teams' systems and coding language. Friesen was forced to train Russ on how to do his job because he lacked the requisite knowledge of the systems and coding language. Friesen alleges that she was more qualified for the position than Russ, and she was denied the position due to her gender and/or pregnancy. Friesen claims that she was denied an interview for the job she was qualified for because it was immediately before she was scheduled to take FMLA leave. Friesen also alleges that this suggests that HQY retaliates against employees who use or attempt to use FMLA leave as a routine practice.

On behalf of Freisen, Lloyd went to Taylor after Russ got the Team Lead job to object to the manner in which they filled the position, and Taylor became extremely angry and aggressive.

He shouted at Lloyd, " I can do whatever I want—I can put anyone in any position I want." Lloyd believed that a prior employee had ben fired for standing up to Lehman and Taylor.   He felt his job at HQY was no longer safe and his days at HQY were limited. About a month after Russ got the Team Lead position, Lloyd quit.

Friesen alleges that she and many of her female colleagues worked unpaid overtime to stay on top of the increasing workload due to the number of employees who quit and Lehman and Taylor's refusal to fill vacant positions.   Friesen worked 60-80 hour weeks doing her own job, took on the caseload of former colleagues, and trained Russ on his new position. Newbold, a male employee, did not work overtime, nor was he pressured to do so the same way his female colleagues were pressured.

Friesen was too scared to take any action for fear of it interfering with her health insurance or upcoming maternity leave. On June 8, 2021, Friesen told Laura Schmidt, a "People Generalist" in HQY's Human Resources department, that she was afraid of retaliation from Lehman and Taylor.   Friesen told Schmidt that she was afraid of losing her health insurance while pregnant and afraid that taking FMLA leave would induce retaliation form Lehman and Taylor. Also on June 8, 2021, during a group conversation with HQY Human Resources, Newbold asked Schmidt why Friesen was not given the Team Lead position because the group was discussing Friesen working too much while pregnant, being afraid to take maternity leave or FMLA leave. Schmidt told Newbold that the "preferred method" for hiring candidates was not followed.   Newbold then asked if there would be any consequences for the "preferred method" not being followed and she responded, "No." From this point forward, Lehman and Taylor escalated their discriminatory behavior toward Newbold.

In late April or early May of 2021, Adam Price wrote an email to Jon Kessler, HQY's

President and CEO, about the "fear of retaliation" he and his teammates working under Lehman and Taylor experienced. While Price feared retaliation from Lehman and Taylor, he was unlikely to need FMLA leave and felt safe enough to reach out to Kessler. Kessler arranged and attended a remote lunch with members of the DIS team on June 14, 2021.   At this lunch, members of the DIS team told Kessler that Lehman and Taylor created an atmosphere of fear of retaliation in order to control their subordinates. Kessler allegedly "paid lip service" to Price and his colleagues during the meeting, but he took no discernable action against Lehman or Taylor.

In July of 2021, Newbold was again anticipating the birth of a child in late July or early August. On July 12, 2021, Newbold applied for another open position with HQY, Data Solutions Engineer I. Newbold spoke with Jonathan Griffin to confirm that his application went into the system correctly and Griffin told him that an interview would be arranged. However, Newbold was not interviewed for the position. Newbold commenced his second FMLA leave on July 30, 2021. HQY did not hire Newbold for the position. Newbold does not identify the individual responsible for the hiring of the position, does not allege that the individual was aware of his FMLA leave, and does not allege who was hired for the position.

On August 18, 2021, when she was about 7 months pregnant, Friesen lost her pregnancy. Friesen, fearful of the culture of retaliation for taking FMLA leave, felt that she had no reasonable alternative than to quit because Lehman and Taylor would fire her if she did not quit. Lloyd had told Friesen about his experience confronting Lehman and Taylor, so she knew they threatened people who stood up to them. She also saw them fire another prior employee for no other discernable reason than standing up to them on working conditions. Friesen reasoned that if she could not get a promotion she was explicitly tapped for, and her supervisors knew she was upset about them hiring Russ, then she too had a target on her back and her time at HQY was

5

limited.   Friesen gave notice of her resignation on October 7, 2021. She resigned or was constructively discharged on October 21, 2021. Friesen filed a Charge with the Equal Employment Opportunity Commission ('EEOC"), alleging that she was forced to resign based on the retaliation she experienced as a woman and pregnant woman.

In October 2021, Newbold applied for another open position as a Data Engineer on a team not under the control of Lehman and Taylor. Craig Condie was the hiring manager for the position, and he told Newbold that he was blocked from hiring Newbold by his managers. Newbold asserts that there was nothing in his employee record that would block him from the promotions. Newbold does not identify the managers who allegedly spoke to Condie and does not allege that Condie knew anything about his FMLA leave. However, Newbold alleges that Lehman and Taylor blocked him from getting the Data Engineer position as retaliation for him taking FMLA leave or in retaliation for his protected speech about Friesen not getting a Team Lead position that he felt she deserved.

Newbold gave notice of his resignation from HQY on November 17, 2021. Newbold felt that HQY's repeated denial of interviews and promotions was writing on the wall that he was on a dead-end path, while the general hostile tenor of his employment under Lehman and Taylor indicated to him that Lehman and Taylor wanted him to quit and that it was a matter of time before they fired him. Newbold had watched a former employee stand up to Lehman and Taylor and get fired and he had now similarly stood up to them on behalf of Friesen.   Newbold resigned or was constructively discharged from HQY on December 1, 2021.

Newbold filed a Charge with the EEOC based on the alleged retaliation that occurred after he reported the discriminatory behavior against Friesen.

2.   Jared Leaman

6

Leaman initially did very well working under Lehman and Taylor and received a promotion in the fall of 2020. Between July and September of 2021, Leaman's son attempted suicide several times. Leaman alleges that he told his superior, Rebecca Lyons, of his son's suicide attempt and his need to leave work. Neither Lyons nor any other employee at HQY informed Leaman of his right to take FMLA leave to attend to a family member's qualifying medical condition. Leaman had not taken or requested FMLA leave during his employment at HQY.

Leaman alleges that he was aware of and had witnessed HQY's practice of denying promotions for employees who took or planned to take FMLA leave. He did not request FMLA leave. At the time, Leaman had weeks of leave accrued but he chose to take as little time off as possible. His wife was forced to miss work instead to either admit their son to acute psychiatric care or be home with him so he would not hurt himself. His wife did not have paid time off at her job. Leaman and his wife chose to take the financial loss from her taking of unpaid leave, to the detriment of her career development, rather than have Leaman use his paid leave and face retaliation from Lehman and Taylor. Leaman was afraid that if he took more time off work to care for his son, Lehman and Taylor might fire him and then he would not be able to afford the expensive psychiatric treatment his son required without his HQY health insurance.

Leaman perceived a shift in his standing at HQY once he took some time off for his son's condition. He felt a "fall from grace" and feared a target was on his back from taking even a couple of days off work. Leaman alleges that he told Taylor that he had been dealing with serious family health issues. But Leaman was too afraid of retaliation to tell Taylor that his son had made multiple suicide attempts and was in and out of acute psychiatric care. Leaman does not know whether Lyons may have told Taylor or Lehman more specifically about what was

going on with Leaman's son. Taylor, however, did not inform Leaman of his right to take FMLA leave to care for a family member with a serious medical issue.

By September of 2021, Leaman had a job offer at another place. Even with the other job offer, Leaman was afraid to take his remaining paid leave for fear that he would be fired and a lapse in health insurance coverage would occur before the new job started. Leaman insists that Lehman's actions successfully interfered and deterred him from taking more paid time off.

After initially filing suit in the District of Utah, Plaintiff Newbold voluntarily dismissed his action and jointly refiled suit with Friesen and Leaman in the Eastern District of Wisconsin. The Wisconsin court granted Defendant's motion to transfer the case back to Utah. This court then asked the parties to re-brief any pending motions under binding Tenth Circuit law. In response, Plaintiffs filed a Second Amended Complaint asserting fourteen causes of action: Family and Medical Leave Act ("FMLA") interference (raised by Newbold, Friesen, and Leaman); FMLA retaliation (raised by Newbold and Friesen); gender discrimination in violation of Title VII (raised by Friesen); Title VII gender discrimination under a disparate impact theory (raised by Friesen); gender discrimination in violation of the Pregnancy Discrimination Act ("PDA") (raised by Friesen); retaliation in violation of Title VII (raised by Newbold); retaliation in violation of the PDA (raised by Newbold); constructive discharge in violation of Title VII (raised by Newbold and Friesen); and constructive discharge in violation of the PDA (raised by Newbold and Friesen). HQY then filed the present motions to dismiss and sever.

## DISCUSSION

HQY brings a Motion to Sever Plaintiffs' Claims pursuant to Federal Rules of Civil Procedure 20 and 21, and a Motion to Dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**Defendant HQY's Motion to Sever**

HQY argues that the court should sever Plaintiffs' claims under Federal Rule of Civil Procedure 20(a) because they are improperly joined or under Federal Rule of Civil Procedure 21 as a matter of discretion. Rule 20(a) allows permissive joinder when (1) claims contain a right to relief arising out of the same transaction or occurrence or the same series of transactions or occurrences and (2) there is a question of law or fact common to all the plaintiffs. Fed. R. Civ. P. 20(a). Even if Plaintiffs satisfy the requirements for permissive joinder under Rule 20(a), the court may sever claims at any time under Rule 21 when "severance will serve the ends of justice and further the prompt and efficient disposition of litigation." *Vivint, Inc. v. Alarm.com,* No. 2:15-CV-392-CW-CMR, 2023 WL 2955648, at *2 (D. Utah Apr. 14, 2023). The court has "virtually unfettered discretion in determining whether or not severance is appropriate." *See id.* (cleaned up).

1. **Rule 20**

HQY argues that Plaintiffs bring multiple claims arising out of three federal statutes and Plaintiffs claims are not related closely enough to be properly joined. HQY relies on cases finding that when claims "turn on distinct facts that are unique to each of the [e]mployees," and the "employees were each discharged at different times for allegedly different reasons and under different circumstances," a "logical relationship binding together [e]mployees' individual claims" does not exist and the claims should be severed. *See Sheets v. CTS Wireless Components, Inc.*, 213 F. Supp. 2d 1279, 1286 (D.N.M. 2002).

Plaintiffs, however, argue that they were coworkers at HQY, in the same department (Data Integration Services, "DIS"), on the same team within DIS, and their claims arise from

actions taken by the same two supervisors—Vice President of Data Integration Services Laurie Lehman and Senior Director of Data Integration Services Philip Taylor. Their claims are seeking relief under FMLA for all Plaintiffs and Title VII for Newbold and Friesen. All three Plaintiffs allege that they had their FMLA rights interfered with or were retaliated against by the same supervisors who fostered a culture of not allowing leave that all three Plaintiffs had to work under. Leaman's FMLA claim arose because he was afraid to take FMLA leave after witnessing what happened to Newbold and Friesen. The alleged acts of discrimination are interrelated, occurred within a similar timeframe when they all worked together under the same supervisors, and demonstrate an alleged pattern or practice of discrimination. The alleged statutory violations under the FMLA and Title VII are factually related. The court, therefore, concludes that the overlapping facts and claims are sufficiently related to be joined in the same lawsuit. Accordingly, the court denies HQY's motion to sever the claims pursuant to Rule 20.

### 2. Rule 21

HQY argues that even if the court disagrees about Plaintiffs' claims being properly joined, the court should still exercise its discretion under Rule 21 to sever the claims.   Under Rule 21, a court "may at any time, on just terms, add or drop a party" and "sever any claim against a party." Fed. R. Civ. P. 21.   This court has broad discretion to deal with the claims as it deems appropriate. "While Rule 21 is primarily directed towards misjoinder and nonjoinder of parties," a "finding of improper joinder is not a prerequisite for granting severance under Rule 21." *Vivint*, 2023 WL 2955648, at *2.

"Factors that courts have considered when evaluating a motion to sever include: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law and fact; (3) whether settlement of the claims or judicial

10

economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for separate claims." *See id.*

The court is reviewing this motion to sever at a preliminary stage. HQY has not answered the Second Amended Complaint. Plaintiffs do not ask the court to deny HQY's motion to sever the claims pursuant to Rule 21 with prejudice because they acknowledge that it is possible that the claims or parties should be severed to prevent prejudice or for judicial economy after discovery is completed. Plaintiffs argue that even if down the line, discovery proves it necessary to sever the Plaintiffs, there is simply no reason to do so before the Complaint has been answered and any discovery has taken place.

Here, the discrimination Plaintiffs allegedly suffered may have been manifested in different ways, but all three Plaintiffs allege harm stemming from the same source. The alleged problems revolved around Laurie Lehman and Phil Taylor. The differences in Plaintiffs' experiences do not alter the fact that they pled a pattern or practice of discriminating and interfering with employees who took FMLA leave from the same supervisors at the same time.

The Supreme Court has explained that "[u]nder the [Federal Rules of Civil Procedure], the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966). While the district court has significant discretion to sever parties and claims, the claims are so interrelated that there could be advantages and efficiencies in this case to proceeding with joint discovery. At a later date, the court can determine whether the matter should be severed for trial. HQY will not suffer prejudice by answering the Second Amended Complaint and completing discovery with the claims joined as

they are. Therefore, at this preliminary stage, the court denies HQY's motion to sever under Rule 21 without prejudice. HQY may renew the motion to sever at the close of discovery.

## Defendant HQY's Motion to Dismiss

HQY moves to dismiss all the claims in Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief may be granted.

### 1. FMLA Interference Claims

HQY argues that although all three Plaintiffs raise FMLA interference claims, they have not pleaded the requisite elements to sustain them. Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). To state a claim for FMLA interference, a plaintiff must plead that "(1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of [Plaintiff's] FMLA rights." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012).

The *McDonnell Douglas* burden-shifting analysis does not apply to interference claims. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002). "[T]he employer bears the burden on the third element of an interference claim once the plaintiff has shown his or her FMLA leave was interfered with." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). No pretext analysis is necessary. *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1228 (10th Cir. 2012). A denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent. *Bones v. Honeywell Int'l*, 366 F.3d 869, 877 (10th Cir. 2004).

### A. Newbold and Friesen

HQY argues that Newbold and Friesen do not plead facts sufficient to show an adverse action related to the exercise of their FMLA rights. HQY claims that there are no facts that HQY interfered with Newbold's ability to take leave with the birth of his two children because he took both leaves. With respect to Friesen's claim, HQY argues that it fails because she does not allege that she was told she could not take leave.

HQY asserts that although Newbold may argue that he generally felt discouraged from taking FMLA leave and that such discouragement suffices, the Tenth Circuit has expressly rejected this theory. An FMLA interference claim cannot be supported by "conduct intended to discourage the use of protected leave" rather than concrete adverse action. *Ford v. Brennan*, No. 21-4086, 2023 WL 5606233, at *3, n.5 (10th Cir. Aug. 30, 2023). *Ford* is of little relevance to this motion to dismiss given that it was decided at the summary judgment and the issue involved what evidence the plaintiff had supporting his claim at the close of discovery. Moreover, HQY recharacterizes the allegations of the Second Amended Complaint in a manner favorable to its own argument. Butt, as the parties are aware, the court must accept all well-pleaded allegations of the Complaint as true and view them in a light most favorable to the nonmoving party.

In the Second Amended Complaint, Newbold alleges that he was not considered for position he applied for and qualified for because he was on FMLA leave or about to take it. A failure to hire or promote is concrete, adverse action, not just mere discouragement. The Tenth Circuit liberally defines adverse employment action. Both "failure to interview" and "failure to promote" constitute "adverse employment decisions' under employment statues, including the FMLA. *Boska v. Wayfair, LLC*, No. 2:19-cv-993-JNP-CMR, 2022 U.S. Dist. LEXIS 132979, at *20 (D. Utah July 22, 2022). And Newbold has alleged that the failure to consider him for other

positions happened contemporaneously with his FMLA leave and as part of a broader pattern of terminating or failing to promote other employees who took FMLA leave. In *Dilpaz*, the Tenth Circuit held that "an interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leaver or while the employee is still on FMLA leave." *Dalpaiz v. Carbon Cnty*, 760 F.3d 1126, 1132 (10th Cir. 2014). Therefore, Newbold's allegations are sufficient at the motion to dismiss stage to plead an adverse action was taken against him and that it had a causal connection to the exercise of his FMLA rights.

HQY argues that the Second Amended Complaint only contains Newbold's and Friesen's beliefs that the two were related and that that the court can dismiss a complaint founded upon a plaintiff's mere belief about a defendant's actions. But the pleading standard does not require a plaintiff to plead facts that could only be known through discovery. The pleading standard contemplates a plaintiff perfecting a "plausible" claim through the discovery process. "The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds'" that discovery will reveal evidence to support the plaintiff's allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

As stated above, Newbold pled that he was denied job interviews and blocked from promotion contemporaneously with his FMLA leaves. Friesen alleges that she was denied a promotion because her supervisors knew that she was pregnant and would be taking FMLA leave when her baby was born. Compl. ¶ 81. HQY takes issue with Friesen's allegations, but they improperly ask the court to view it in the light most favorable to HQY instead of properly viewing in the light most favorable to Friesen. Moreover, HQY attacks the allegations as if the matter was at the summary judgment stage. Such arguments are unavailing at the motion-to-dismiss stage. The closer the adverse employment action is to the protected activity, the more

likely it evidences a causal connection. Newbold and Friesen have also alleged that HQY had a pattern of such denials with respect to employee's taking FMLA leave. Plaintiffs further pled that individuals who did not take FMLA leave received interviews and promotions. Until the parties engage in discovery on the claims, the court cannot know whether those allegations are in fact true. However, the court must accept them as true at the motion-to-dismiss stage, and the court finds that these allegations are sufficient to survive a motion to dismiss Newbold and Friesen's FMLA interference claims.

### B.  Leaman

HQY argues that Leaman has not pleaded a concrete adverse action that interfered with his ability to take FMLA leave because he did not request leave or have any allegedly adverse action taken against him. Leaman claims that he did not request leave because he thought such leave was discouraged and could impact any chances for promotion based on what he saw with other employees.

Leaman did not allege that he informed HQY of a desire to take FMLA leave. HQY points to cases holding that plaintiffs must put their "employer on notice that [they] might be entitled to leave under the FMLA to succeed on an interference claim under the FMLA." *Patterson v. Goodyear Tire & Rubber Co.*, No. 08-2060-EFM, 2011 WL 1484153, at *10 (D. Kan. Apr. 19, 2011). However, *Patterson* is a summary judgment case, and it cites to other summary judgment cases. These cases HQY cites to the court do not indicate that a plaintiff must plead notice as an element for an FMLA interference claim in the Tenth Circuit. "Unlike the Tenth Circuit, the Sixth Circuit has explicitly made notice part of its test for interference with FMLA rights. . . . Because this circuit's precedents do not include notice as part of the interference analysis, this court declines to follow the Sixth Circuit's approach." *Bones v.*

15

*Honeywell Internt'l, Inc.*, 366 F.3d 869, at 877 n.2 (10th Cir. 2004) (citing *Diffee Ford-Lincoln-Mercury*, 298 F.3d at 960-61.). Whether Leaman gave adequate notice to HQY is an issue of fact more properly considered on summary judgment. HQY is improperly requiring Plaintiffs to plead a non-element of FMLA interference claims to survive a motion to dismiss.

In addition, in the Tenth Circuit, it is the employer's duty to notify the employee of his or her FMLA rights. In *Tate v. Farmland Indus.*, the Tenth Circuit held that the FMLA "does not require a covered employee to specifically ask for FMLA benefits. An employee need not expressly assert rights under the FMLA or even mention the FMLA." 268 F.3d 989, 997 (10th Cir. 2001). "If the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply." *Id.* In *Tate*, the Tenth Circuit held that the plaintiff had an FMLA interference claim based on the employer's "failure to personally notify him of his FMLA rights." *Id.* at 997 n.11.

Plaintiffs only needed to inform HQY about an event that "might" qualify them for FMLA, and then HQY had a duty to inform them about their potential right to take FMLA leave. Leaman told Lyons about his son's suicide attempt and told Taylor he had missed work to attend to "serious family health issues." There is no requirement in the Tenth Circuit that Leaman tell someone at HQY that he needed leave to care for a family member. He only needed to tell someone at HQY about an event that could qualify for FMLA leave. Leaman informed two different supervisors of an FMLA qualifying event and nobody at HQY informed him of the right to take FMLA leave.

HQY relies on the facts indicating that Leaman was afraid to take leave lest HQY retaliate against him as proof that there was no FMLA interference. But there is no state of mind analysis required to prevail on an FMLA interference claim. HQY failed to inform him of his

FMLA rights once he told his supervisors of an FMLA qualifying event. HQY cannot, in good faith, claim that Leaman did not want to take leave to be with his son when Leaman left work to be with his son. He did this despite being afraid of the consequences. Leaman pled: "At one point, feeling pressured to inform Taylor of why he had repeatedly left work, Leaman told Taylor that he had been dealing with serious family health issues." Compl. ¶ 120. Taylor's failure to respond to this by informing Leaman of his FMLA leave rights is the basis for Leaman's FMLA interference claim.

HQY argues that although Leaman claims that HQY should have known he qualified for FMLA leave because he told supervisors about his son's medical issues, Leaman may recover only if he shows that the alleged FMLA violation in not telling him about his right to leave prejudiced him.   HQY contends that Leaman has alleged no facts that show any prejudice from HQY's alleged FMLA violation because Leaman decided not to take leave and there is no indication that HQY's presentation of FMLA paperwork for Leaman to consider would have changed his mind about taking leave. HQY's arguments ask the court to make a lot of inferences in its behalf. But that is not the standard the court must apply. Leaman alleged that he feared being fired if he took leave because he would then be unable to afford the treatment his son needed without insurance. Leaman also feared that he had a target on his back for the limited time off he actually took and had to look for another job.   The court believes there is enough alleged for the parties to explore the adverse action in discovery.

### 2.  FMLA Retaliation Claims

HQY asks the court to dismiss Newbold and Friesen's FMLA retaliation claims, arguing that they have failed to plead sufficient facts and rest their claims on unsupported speculation. The FMLA prohibits employers from retaliating against an employee who exercises or attempts

to exercise FMLA rights. 29 U.S.C. § 2615(a). FMLA retaliation claims require a plaintiff to show: "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).[2]

HQY acknowledges that Newbold has adequately alleged that he engaged in protected activity by taking FMLA leave. But HQY argues that Friesen has not because she has not adequately alleged that she requested FMLA leave. The Second Amended Complaint alleges that Friesen's supervisors Lehman and Taylor were aware of her pregnancy and that she would take FMLA leave when the baby was born. Plaintiffs argue that there is no hyper-technical reason for her to state that she was approved for leave, and her failure to specifically state that, when HQY has her employment records and knows that she had been approved of leave, is not grounds for dismissal of her claim. The court agrees. The court must view the alleged facts in the light most favorable to Friesen and a reasonable inference from her allegation is that she had already requested FMLA leave. Requesting leave is a protected activity.

Under the second element, Newbold and Friesen must plead that HQY took a materially adverse action against them. Plaintiffs claim that HQY's failures to promote them were materially adverse actions and their allegedly constructive discharges were materially adverse actions. But to state retaliation claims, Plaintiffs must also allege a causal connection between protected activities and the alleged materially adverse actions they suffered. HQY argues that

---

2   The timing of an adverse action often determines whether a plaintiff has an interference or retaliation claim, with interference claims occurring before FMLA leave is taken or attempted to be taken, and retaliation claims occurring after a plaintiff has returned from FMLA leave. *Campbell*, 478 F.3d at 1287-88. The court in *Campbell* upheld a plaintiff's right to pursue both a theory of FMLA interference and retaliation over the same adverse action. *Id.* at 1288.

Plaintiffs allege only their belief that there is a causal connection and that Plaintiffs' suspicions that HQY behaved improperly is insufficient even at this early juncture.

HQY asserts that to show a causal connection between their protected activity and their adverse actions, Plaintiffs must establish that the person who decided to take such action had knowledge of their FMLA-protected activity. *Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1212-13 (10th Cir. 2018) ("a protected activity cannot be a cause of an unfavorable personnel action where the person or persons authorizing the unfavorable personnel action do not know about the protected activity"). Again, HQY cites to a case decided at the summary judgment stage. *Lincoln* is of little help to the court. What a plaintiff must prove at the summary judgment stage after the close of discovery is very different from what a plaintiff must allege in his or her complaint. Based on the holdings of *Smith, Bones*, and *Banda*, it seems highly unlikely the Tenth Circuit would require the pleading of any decisionmaker's knowledge at the pleading stage. Such a factual issue is more properly decided on summary judgment.

HQY asserts that Newbold and Friesen do not allege that the decisionmakers with respect to their promotions knew about their FMLA leave. But the court disagrees. The facts alleged and the inferences to be drawn from those facts are that Lehman and Taylor knew of Newbold and Friesen's FMLA leaves and influenced the decisionmakers. Newbold states that one decisionmaker told him he was influenced by superiors. Friesen alleges that the outgoing Team Lead requested that she take his position, but he was overruled by other superiors because of her pregnancy and impending leave. Newbold and Friesen are not in a position to know who exerted such alleged influence until they depose the involved employees. The true decisionmaker responsible for the alleged discrimination will not be known until facts are discovered. The person announcing a new hire is not necessarily the person who decided which candidate was

19

selected. Despite HQY's repeated attempts to turn this motion to dismiss into a motion for summary judgment before the case even gets started, this is only a motion to dismiss.

For purposes of the retaliation claim, the "'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1171 (10th Cir. 2006). Plaintiffs are not required to prove the inferences their pled facts allow the court to draw or to demonstrate that it is the best or only inference. Plaintiffs need only plead circumstances which "give rise to an inference of unlawful discrimination." *Id.*

The court concludes that Friesen's allegations are sufficient to plead that she engaged in protected activity and there was a causal connection between that activity and her failure to be promoted to Team Lead. Friesen pled facts which allow the court to infer a retaliatory motive as a plausible explanation for her failure to be interviewed or selected as the new Team Lead because she had requested and been approved for an upcoming FMLA leave. The person exiting the position suggested that Friesen was who should replace him, but she was not interviewed or selected. A less experienced male employee was given the position, and Friesen was asked to train him on how to do the job. It is reasonable to infer that she was passed over because of her upcoming leave. At this stage, Friesen is not required to prove her claim.

Newbold can prove causation based on timing alone and has pled a prima facie case of retaliation. A "plaintiff may rely on temporal proximity alone only if 'the [adverse action] is very closely connected in time to the protected activity.'" *Metzler*, 464 F.3d at 1171-72. Newbold has pled that he was denied interviews and promotions within weeks of taking FMLA leave. These facts alone provide a sufficient causal connection at this state of the litigation.

20

The court, therefore, concludes that Newbold and Friesen have adequately stated claims for FMLA retaliation.   Accordingly, the court denies HQY's motion to dismiss the FMLA retaliation claims.

### 3.   Title VII and PDA Claims

HQY argues that the court should dismiss Plaintiffs' Title VII and PDA claims because: (1) Friesen's claims are time barred; (2) there is no such claim as a stand-alone constructive discharge claim; (3) Plaintiffs have not alleged facts demonstrating that they were constructively discharged; (4) Friesen has not plead facts sufficient to state a claim for gender discrimination and disparate impact claims; and (5) Newbold and Friesen have not pled facts sufficient to state their Title VII or PDA claims. Plaintiffs assert that there is no merit to HQY's contentions and that the court should allow the claims to proceed to discovery.

#### A.  Statute of Limitations

HQY argues that Friesen's gender discrimination and disparate impact claims are barred by the statute of limitations. The limitations period that applies to Friesen's gender discrimination and disparate impact claims is 300 days. 42 U.S.C. § 2000e-5(1). HQY asserts that Friesen does not plead any alleged discrimination occurring 300 days before she filed an EEOC claim. Friesen, as a Utah resident, was required to file a claim with the EEOC or UALD within 300 days of the alleged unlawful employment practice. Friesen's charge was filed on August 1, 2022, and 300 days prior to that was October 5, 2021. The only action that happened within that window was Friesen giving notice of her resignation on October 7, 2021, and her last day of work on October 21, 2021.

Friesen relies on *Green v. Brennan*, 578 U.S. 547 (2016) to support her theory that her claims are not time barred. Friesen asserts that *Green* is the seminal case on the statute of

limitations in Title VII constructive discharge cases. In *Green*, the Court addressed "when the limitations period begins to run for an employee who was not fired, but resigns in the face of intolerable discrimination—a 'constructive' discharge." *Id.* at 550. The *Green* Court held that "the 45-day clock for a constructive discharge begins running only after the employee resigns." *Id.* The Court reasoned that because the statute of limitations does not begin to run for employees discharged for discriminatory reasons until the date of discharge, it stands to reason that the statute of limitations begins to run for constructively discharged employees when they give their notice of resignation. *Id.* at 557. "If the limitations period begins to run following the employer's precipitating discriminatory conduct, but before the employee's resignation, the employee will be forced to file a discrimination complaint after the employer's conduct and later amend the complaint to allege constructive discharge after he resigns." *Id.* Previous discriminatory conduct must be considered as part of the constructive discharge analysis. "[A] constructive-discharge claim requires two basic allegations: discriminatory conduct by the employer that leads to resignation of the employee. So long as those acts are part of the same, single claim under consideration, they are part of the 'matter alleged to be discriminatory,' whatever the role of discrimination in each individual element of the claim." *Id.* at 556-57.

HQY argues that Friesen's gender discrimination and disparate impact claims are time barred because the applicable statute of limitations ran from the date of the alleged discrimination, not her constructive discharge. But this is contrary to *Green.* Under a constructive discharge claim, the court must consider the prior discriminatory acts in order to determine whether they made the situation so intolerable that the employee could not continue working. "A claim of constructive discharge requires proof of a causal link between the allegedly intolerable conditions and the resignation." *Id.* at 563. The date of resignation incorporates all

22

the discrete acts of discrimination leading up to the discharge to create a "complete and present cause of action." *Id.* at 555. Therefore, the court finds that Friesen's claims are timely under Green because her notice of resignation was within three hundred days of her discrimination claim with the UALD/EEOC.

### B. Constructive Discharge

HQY argues that constructive discharge is not a stand-alone claim, and, even if it is, Plaintiffs have not pled facts sufficient to state such a claim. HQY asserts that constructive discharge is a materially adverse action within a discrimination or retaliation claim, not a standalone claim under Title VII and PDA. Plaintiffs argue that the Supreme Court's decision in *Green v. Brennan*, 578 U.S. 547 (2016) clarifies all these issues. The *Green* Court discussed the plaintiffs constructive discharge claim pursuant to Title VII as its own separate cause of action. The Court set out the "two basic elements" for "[a] claim of constructive discharge." *Id.* at 555., And the Court recognized that it had previously "held that constructive discharge is a claim distinct from the underlying discriminatory act. . . . This holding was no mere dictum." *Id.* at 559. The court, therefore, does not agree with HQY that constructive discharge is only an adverse action.

On the merits of the claim, HQY argues that Newbold's and Friesen's constructive discharge claims under Title VII and PDA fail because the alleged conduct is not objectively intolerable. Plaintiffs' voluntary resignations do not rise to the level of constructive discharge. The bar for constructive discharge is high. Plaintiffs would need to allege facts showing that their working conditions are HQY were so intolerable that they were forced to resign, and that any reasonable employee would feel the same way.  *Penn State Police v. Suders*, 542 U.S. 129, 141 (2004). "The inquiry is objective: Did working conditions become so intolerable that a

reasonable person in the employee's position would have felt compelled to resign?" *Id.* A "plaintiff must show he had no other choice but to quit." *See Baca v. Sklar*, 398 F.3d 1210, 1217 (10th Cir. 2005).

The Tenth Circuit recently noted that the argument that an employee no longer had "an equal opportunity to be promoted" was not enough to sustain a constructive discharge theory. *Waggoner v. Frito-Lay, Inc.*, No. 22-3111, 2023 WL 2967693, at *7 (10th Cir. Apr. 17, 2023) (unpublished). "A denial of promotion, even if discriminatory, does not necessarily establish a reasonable person would have felt compelled to resign." *Id.*

Plaintiffs, however, assert that the Tenth Circuit recognizes two types of constructive discharge: the type where the work environment becomes so intolerable the employee feels that the only recourse is to resign, and the type where an employee is faced with a choice between resigning or being fired. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996). The Tenth Circuit has found the "resign or be fired" type of constructive discharge where the employer deliberately withheld necessary training to give the employer an excuse to fire the plaintiff. *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1573 (10th Cir. 1992). Although Plaintiffs also point to Seventh Circuit cases that expand the "resign or be fired' line of cases to "quit because you have no future," those cases would appear to conflict with the Tenth Circuit's decision in *Waggoner*.

This case is in its early stages. In *Waggoner*, the court was reviewing the case after summary judgment had been granted and the parties had engaged in discovery on the conditions of employment leading up to the plaintiff's resignation. 2023 WL 2967693, at *7. The court found that the plaintiff's asserts that he would not have an equal opportunity to be promoted and might be fired for his age were based on his own speculation. *Id.* But it was making such

findings after the plaintiff had had the opportunity to engage in discovery on those contentions. In this case, Newbold and Friesen allege that they felt they needed to quit or be fired because they had seen another employee fired for challenging Lehman and Taylor on FMLA leave issues, there was unreasonable pressure to work 60-90 hours per week, and only those who did not engage in protected activity under the FMLA received promotions. While this may not ultimately be enough to meet the objective reasonableness standard, at this early stage, the court does not know the full picture of the factual situation the plaintiffs found themselves in when they felt compelled to resign. The court would need all the accompanying facts in the record before applying the objectively reasonable standard. Plaintiffs have alleged some facts that could put the case in a "quit or be fired" category. Therefore, the court finds that the parties should engage in discovery prior to that determination. Accordingly, the court denies HQY's motion to dismiss Plaintiffs' constructive discharge claims.

### C.  Friesen's Title VII and PDA Claims

HQY argues that Friesen fails to plead discrimination under either theory she advances. To succeed on a sex discrimination claim, Friesen must establish "(1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in her protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Friesen alleges that she suffered two adverse employment actions: failure to interview and failure to promote, both with respect to the Team Lead position. At the time HQY failed to promote her to the Team Lead position, Friesen was (and is) a woman and pregnant. The outgoing Team Lead suggested that Friesen replace him. But HQY did not interview anyone for the position and did not promote her to the position. Instead, HQY filled the position with a man,

who did not have her level of experience. Friesen alleges that her outgoing Team Lead's recommendation that she replace him demonstrates that she was qualified for the position. In addition, after HQY failed to promote her, a supervisor asked her to train the man who got the position because he did not have the experience or expertise needed for the position. An inference to be drawn from the request is that HQY knew that she was qualified for the position and that he was not or was not as qualified as she was. Friesen has alleged all the necessary elements for a plausible sex discrimination claim.

HQY asserts that Friesen does not allege disparate impact but rather universal impact because Plaintiffs allege that HQY also discriminated against men who sought to use FMLA leave. But separate from the FMLA claims, Friesen alleges that the environment at HQY caused a disparate impact on her in relation to her male co-workers who were not pregnant. Plaintiffs pled that women were treated worse than men. Compl. ¶ 204. She adequately pled more than universal impact. Friesen's allegations sufficiently give rise to a plausible inference of sex and pregnancy discrimination under her Title VII and PDA claims.

### D.  Newbold's Title VII and PDA Claims

HQY asks the court to dismiss Newbold's retaliation claims under Title VII and the PDA. Plaintiffs counter that they pled Newbold's Title VII and PDA claims sufficiently to withstand a motion to dismiss. To adequately allege retaliation under Title VII or PDA, Newbold would have to plead facts sufficient to show "(1) that []he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Khalik*, 671 F.3d at 1193.

Newbold alleges that he engaged in statutorily protected activity by openly opposing the

discriminatory hiring practices that led to Friesen being passed over for the Team Lead position due to her gender, pregnancy status, and imminent use of FMLA leave. Newbold asked human resources if any corrective action would be taken against the perpetrators of the discrimination, Lehman and Taylor. Shortly after this protected activity, Newbold was denied the opportunity to interview for the Data Solutions I Engineer Position, for which he was sufficiently qualified. Newbold also pled that Lehman, alone or in concert with her subordinates, unfairly disparaged Newbold to the Data Engineer hiring managers after his protected activity. As discussed above, Newbold also has temporal proximity between his protected activity and the alleged retaliation. Newbold does not need to prove causation at the pleading stage. The parties can explore in discovery how much the supervisors knew, HR knew, or each passed along to each other about Newbold's protected activity. There is no obligation for Newbold to have all those facts at this early stage. Plaintiffs need only raise a plausible claim at this stage, and these allegations sufficiently satisfy the elements of Title VII and PDA retaliation claims.

## CONCLUSION

Based on the above reasoning, Defendant's Motion to Sever Plaintiffs' Claims [ECF No. 82] is DENIED under FRCP 20 and DENIED WITHOUT PREJUDICE under FRCP 21 and Defendant's Rule 12(b)(6) Motion to Dismiss [ECF No. 83] is DENIED.

DATED this 23rd day of January 2025.

BY THE COURT:

DALE A. KIMBALL,
United States District Judge

27